UNITED MISSOURI BANK, N.A., Conservator of the Estate of Dennis Gallagher, Appellant,

v.

CITY OF GRANDVIEW, et al., Respondent.

No. WD 61111.

Missouri Court of Appeals, Western District.

May 30, 2003.

---

Ronald M. Sokol, St. Joseph, for appellant.

Randall D. Thompson, Dana M. Harris, Kansas City, for respondent.

Before BRECKENRIDGE, P.J., HOLLIGER and LOWENSTEIN, JJ.

PATRICIA BRECKENRIDGE, Judge.

United Missouri Bank, N.A., (UMB) acting in its capacity as conservator of the estate of Dennis Gallagher, appeals from a judgment entered in the Circuit Court of Jackson County granting summary judgment for the City of Grandview, Missouri, and J & D Enterprises. UMB raises five points on appeal challenging the propriety of summary judgment. This court finds that summary judgment is not appropriate in this case because genuine issues of material fact exist on the issue of causation. Moreover, the trial court erred in granting summary judgment to the City to the extent that it based its judgment on a finding

that the dangerous condition of the road was the result of zoning decisions for which sovereign immunity was not waived. Accordingly, the judgment of the trial court is reversed and the cause is remanded.

### Factual and Procedural Background

■ When reviewing summary judgments, this court reviews the record, and any reasonable inferences from the record, "in the light most favorable to the party against whom judgment was entered." *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). On October 9, 1996, at approximately 5:28 P.M., Walter Klammer drove from the center exit of The Farm Center, a shopping center, in Grandview, Missouri, heading across Blue Ridge Boulevard. As he crossed the second eastbound lane, his car was struck on the lower part of the driver's side door by a motorcycle driven by Dennis Gallagher that was heading east on Blue Ridge Boulevard. As a result of the accident, Mr. Gallagher was taken to the hospital and treated for brain stem injuries.

Subsequently, UMB, acting in its capacity as conservator of the estate of Mr. Gallagher, filed suit against Respondents, the City of Grandview, Missouri ("the City"), and J & D Enterprises, the owners of The Farm Center.[1] UMB alleged that the dangerous condition of the intersection caused the accident between Mr. Gallagher and Mr. Klammer's vehicles. UMB's petition alleged that the City was negligent in approving, and both the City and J & D Enterprises were negligent in allowing or causing, the center exit from the parking lot to be constructed and maintained in a location that provided traffic on Blue Ridge Boulevard with limited visibility of vehicles exiting the parking lot at that location and provided inadequate visibility to the exiting vehicles. The petition further alleged that the City and J & D Enterprises negligently allowed a fence to be built and trees to be planted along the roadway which blocked or reduced the sight distance for drivers and allowed cars to park in the parking lot near the exit which blocked or reduced drivers' visibility. The petition also contended that the City and J & D Enterprises were negligent for failing to properly warn approaching traffic of this dangerous intersection, failing to post reduced speed limit signs for traffic on Blue Ridge Boulevard due to the hazardous nature of the intersection, and allowing the exit to be constructed without a stop sign for drivers exiting the parking lot and without a stop line telling drivers where to stop due to the limited sight distance.

After some discovery had been completed in the case, the City and J & D Enterprises filed separate motions for summary judgment. In both summary judgment motions, the parties argued that the uncontroverted facts established that Mr. Klammer's actions were responsible for the accident and there were no witnesses that could establish that visibility at the intersection played a part in the accident. In its motion, the City also argued that the actions forming the basis for UMB's claims of negligence against it were all related to governmental functions and that the City should be shielded from liability under the public duty doctrine. The City further argued that allegations related to the failure to properly warn and failure to post reduced speed limit signs were not dangerous conditions and that UMB failed to allege any condition that made Blue Ridge Boulevard dangerous.

---

**1.** UMB entered into a settlement agreement with Mr. Klammer without filing suit, reserving its claims against the City and J & D Enterprises.

After taking the motions under advisement, the trial court granted summary judgment in favor of the City and J & D Enterprises on February 25, 2002. The trial court found that the direct cause of the accident was the conduct of Mr. Klammer and that no evidence in the record established that the trees or fence contributed to Mr. Klammer's decision to pull out in front of traffic. The trial court also found that the actions of the City in approving the plans for the exit and related landscaping were zoning and zoning is a governmental function for which sovereign immunity was not waived. UMB filed this appeal.

### Standard of Review

Appellate review of a summary judgment is essentially *de novo*. *ITT*, 854 S.W.2d at 376. This court's criteria for ascertaining the propriety of summary judgment are the same as those which a trial court uses initially. *Id.* This court does not defer to the trial court's order granting summary judgment because the trial court's initial judgment is based on the record submitted and amounts to a decision on a question of law. *Id.* Summary judgment is appropriate where the moving party establishes a right to judgment as a matter of law and that no genuine issue of material fact exists. *Id.* at 378.

For movants who are the defending parties in a lawsuit, the *prima facie* showing required by Rule 74.04 is "necessarily different." *Id.* at 381. A defending party may establish a right to judgment as a matter of law by showing:

(1) facts that negate any one of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements, or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense.

*Id.*

### Failure to Raise Procedural Errors in Trial Court Precludes Appellate Review

Before addressing UMB's allegations of substantive error, this court will address UMB's claim in its third point that J & D Enterprises violated Rule 74.04(c)(1) by incorporating by reference the summary judgment motion and suggestions in support thereof filed by its predecessor in interest, the previous owner of the property, The Farm Center, L.L.C. UMB concedes in its reply brief that it did not properly raise this issue in the trial court. This court's review of the grant of summary judgment is limited to those issues raised in the trial court, and this court "will not review or convict a trial court of error on an issue that was not put before the trial court to decide." *Barner v. The Mo. Gaming Co.*, 48 S.W.3d 46, 50 (Mo.App.2001). Accordingly, UMB's third point was not properly preserved for appeal and will not be considered.

### Disputed Issues of Material Fact on Causation

In its first, fourth, and fifth points, UMB contends that the trial court erred in entering summary judgment in favor of the City and J & D Enterprises based upon its conclusion that UMB would not be able to establish that a dangerous condition of the property "directly caused" the accident. Public entities, such as the City, are generally immune from tort liability under the doctrine of sovereign immunity. *Larison v. Pub. Water Supply*

*Dist. No. 1 of Andrew County*, 998 S.W.2d 192, 195 (Mo.App.1999). This immunity is waived under section 537.600.1(2), however, "for conditions of property when the property is in a dangerous condition due to a negligent or wrongful omission, a reasonably foreseeable injury directly results, and the public entity had actual or constructive knowledge of the problem and could have corrected it." *Linton v. Mo. Highway & Transp. Comm'n*, 980 S.W.2d 4, 6 (Mo.App.1998). Thus, to establish that the City was not entitled to invoke sovereign immunity as a defense to this action based upon the dangerous condition exception, UMB was required to prove:

"(1) [A] dangerous condition of a public entity's property at the time of injury; (2) that the injury directly resulted from the dangerous condition; (3) that the dangerous condition created a reasonably foreseeable risk of harm of the kind that the plaintiff incurred; and (4) that either (a) a public employee's negligence or wrongful act or omission within the course of his employment created the dangerous condition, or (b) the public entity had actual or constructive knowledge of the dangerous condition."

*Larison*, 998 S.W.2d at 195.

■■■ "The phrase 'directly resulted from' in section 537.600.1(2) is synonymous with 'proximate cause.'" *State ex rel. Mo. Highway & Transp. Comm'n v. Dierker*, 961 S.W.2d 58, 60 (Mo. banc 1998). Proximate cause is the standard required to hold J & D Enterprises liable. *Oldaker v. Peters*, 869 S.W.2d 94, 100 (Mo.App.1993). Accordingly, this court will apply the same principles and rules in examining issues related to proximate cause for the purpose of establishing J & D Enterprises' general tort liability for negligence as it will in examining whether the plaintiff's injury was a direct result of a dangerous condition of the City's property for sovereign immunity purposes. *Smith v. Coffey*, 37 S.W.3d 797, 801 (Mo. banc 2001).

■■■ "'The practical test of proximate cause is generally considered to be whether the negligence of the defendant is that cause or act of which the injury was the natural and probable consequence.'"[2] *Hale ex rel. Hale v. City of Jefferson*, 6 S.W.3d 187, 194 (Mo.App.1999) (quoting *Dierker*, 961 S.W.2d at 60). "'The test is not whether a reasonably prudent person would have foreseen the particular injury but whether, after the occurrences, the injury appears to be the reasonable and probable consequence of the act or omission by the defendant.'" *Martin v. Mo. Highway & Transp. Dep't*, 981 S.W.2d 577, 584 (Mo.App.1998) (quoting *Oldaker*, 869 S.W.2d at 100). "'The negligence of the defendant need not be the sole cause of the injury, as long as it is one of the efficient causes thereof, without which injury would not have resulted.'" *Id.* (quoting *Oldaker*, 869 S.W.2d at 100). Ordinarily, causation is an issue that should be left to the trier of fact. *Hale*, 6 S.W.3d at 194. *See also Williams v. Mo. Highway & Transp. Comm'n*, 16 S.W.3d 605, 611 (Mo.App. 2000).

In its motions for summary judgment, the City and J & D Enterprises argued that the uncontroverted facts showed that UMB could not establish that any of the dangerous conditions related to the inter-

**2.** The Supreme Court has held:
"Proximate cause requires something in addition to a 'but for' causation test because the 'but for' causation test serves only to exclude items that are not causal in fact; it will include items that are causal in fact but that would be unreasonable to base liability upon because they are too far removed from the ultimate injury or damage."
*Dierker*, 961 S.W.2d at 60 (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 865 (Mo. banc 1993)).

section alleged by UMB in its petition proximately caused Mr. Gallagher's injuries. The City and J & D Enterprises contended that the uncontroverted facts demonstrated that Mr. Klammer was able to see the approaching eastbound traffic and was trying to beat those vehicles across the intersection and argued that these actions precluded the possibility that the alleged dangerous conditions of the intersection contributed to cause the accident.

The facts the City and J & D Enterprises rely upon were from the deposition testimony of the investigating police officer and one eyewitness to the accident. The investigating officer testified that, after the accident, Mr. Klammer told him "that he thought that if he hurried up, he could make it across the street." The officer understood Mr. Klammer to mean that if he hurried, he could beat traffic that was coming down Blue Ridge Boulevard.

The eyewitness to the accident, Susan Hollon, testified that she was driving east in her minivan in the right-hand lane of Blue Ridge Boulevard behind Mr. Gallagher's motorcycle and three other vehicles. According to Ms. Hollon, she and the four vehicles in front of her were all traveling at a speed of thirty-five miles per hour or less when they approached Mr. Klammer. Ms. Hollon testified in her deposition that she saw Mr. Klammer's car shortly after pulling out of the McDonald's parking lot located next to The Farm Center on Blue Ridge Boulevard. She stated that she saw him "pulled out pretty far" in the middle exit, "looking at traffic." She said that there were no visual obstructions between where she was and where Mr. Klammer was. She testified that she saw him pause at the middle exit for a couple of seconds before he "punched it" and pulled out into the street, screeching his tires. She stated that less than two seconds passed between

the time Mr. Klammer began to pull out of the parking lot and the time of the collision.

The City and J & D Enterprises argued that this evidence conclusively established that Mr. Klammer saw Mr. Gallagher and the rest of the oncoming traffic and chose to try to beat the oncoming traffic and cross the intersection. The City and J & D Enterprises contended that this evidence established that Mr. Klammer's negligence was the sole cause of the accident and precluded a causal connection between any problems with the intersection or exit and the collision. The trial court accepted this argument and found that "[t]he direct cause of this injury was the conduct of Klammer" and "no evidence shows that the trees and fence contributed to Klammer pulling out into traffic improperly."

The problem with the trial court's conclusion is that UMB presented evidence that disputed the City's and J & D Enterprises' evidence as to the circumstances surrounding the collision and Mr. Klammer's conduct. Specifically, with regard to Ms. Hollon's testimony that there were no visual obstructions between her and Mr. Klammer, the evidence was that Ms. Hollon was driving a minivan and, as she testified, "Since it's a minivan, you know, ... I'm over the top, and I can see." As for her testimony about the location of the various vehicles and their speeds, UMB's expert, John C. Glennon, a traffic engineer, testified that if the circumstances were as Ms. Hollon described them, there would have been a "six-car pileup" instead of a two-vehicle collision.

Likewise, James London, another eyewitness to the accident, testified that there were no cars around the motorcycle at the time the collision occurred, and other cars did not approach the accident area until thirty to forty-five seconds after the accident. Also, directly contrary to Ms. Hol-

lon's testimony that Mr. Klammer "punched it" to get across the street and the accident occurred two seconds later, Mr. London testified that Mr. Klammer's vehicle pulled out slowly from the exit and that approximately five seconds passed between the time he began to pull out and the collision. Moreover, the investigating officer testified that he did not find any acceleration or skid marks from Mr. Klammer's vehicle, and his police report diagram shows no skid or gouge marks from any of the vehicles traveling on Blue Ridge Boulevard at the time of the accident except Mr. Gallagher's motorcycle.

In accepting Ms. Hollon's testimony, the trial court chose to disregard testimony questioning the accuracy of her account of the circumstances surrounding the collision, and the court clearly found her testimony more believable than any contradictory testimony. The trial court is not allowed to make credibility determinations when considering summary judgment motions, however. *Larison*, 998 S.W.2d at 196. "Rather, such matters are for determination following a complete trial." *Id.* At trial, the trier of fact could believe the City's and J & D Enterprises' evidence, or it could find that the City's and J & D Enterprises' evidence was not credible nor entitled to any weight. Because the credibility of the evidence was disputed, a genuine issue of material fact on the issue of Mr. Klammer's negligence remains to be resolved. *Id.* at 197.

Even if credibility was not at issue, the City's and J & D Enteprises' evidence was susceptible to more than one inference. When determining whether summary judgment is proper, the evidence and all reasonable inferences are to be viewed in the light most favorable to the non-moving party. *Hale*, 6 S.W.3d at 195. If the movant requires an inference to establish the right to summary judgment,

"and the evidence reasonably supports any inference other than (or in addition to) the movant's inference, a genuine dispute exists" and the movant is not entitled to summary judgment. *ITT*, 854 S.W.2d at 382.

To support the grant of summary judgment, Ms. Hollon's testimony that she thought Mr. Klammer was looking out at traffic when she first saw him requires an inference that Mr. Klammer *actually saw* the approaching eastbound vehicles. Likewise, Mr. Klammer's ambiguous statement "that he thought that if he hurried up, he could make it across the street," requires an inference that Mr. Klammer actually saw eastbound traffic *before* pulling out into the intersection. Mr. Klammer's statement, however, would also support an inference that he first saw the approaching cars from the east *after* he started into the intersection and then increased his speed to try to avoid them. Another reasonable inference from this statement is that Mr. Klammer saw the traffic coming from the other direction, and thought if he hurried up, he could beat the *westbound* traffic.

While the evidence may well support an inference that Mr. Klammer actually saw the oncoming eastbound traffic while stopped at the exit and wrongly believed he could make it across the intersection, the evidence also supports inferences that Mr. Klammer did not see the eastbound cars approaching until after he entered the intersection and at that time thought that he could beat the cars if he hurried, or that Mr. Klammer saw the westbound cars approaching and thought he could beat the westbound traffic if he hurried.

The evidence supporting these contrary inferences came from UMB's expert, Mr. Glennon. According to Mr. Glennon, *A Policy on Geometric Design of Streets and Highways, 1990,* by the American Association of State Highway and Transpor-

tation Officials (AASHTO), is "regarded worldwide as the authoritative source on roadway sight distance requirements for safety." In the Policy, the AASHTO recommends minimum sight line distances for certain intersections. The AASHTO's recommended sight line "distance is determined by the minimum needs of the stopped driver to scan the intersection, accelerate, and clear intersecting traffic." The AASHTO Policy specifies a minimum sight distance of 405 feet to the left for a driver turning left onto a street with a speed limit of forty miles per hour, in order to clear the traffic to the left. The exit from which Mr. Klammer pulled out onto Blue Ridge Boulevard, however, had a sight distance to the left of only 290 feet.[3] Furthermore, Mr. Glennon testified that the curvature of Blue Ridge Boulevard at this location "exacerbate[d] the sight distance restriction." Even Ms. Hollon testified that, in the three years that she had operated a store at The Farm Center, she had rarely turned left onto Blue Ridge Boulevard from that exit because the curve in the road made it difficult to see to the left.[4]

Mr. Glennon testified that sight distance requirements are necessary because drivers have multiple directions to look in and consider. Mr. Glennon testified that even if Ms. Hollon and the other vehicles were within view of Mr. Klammer at the time he pulled out, Mr. Klammer may have already looked in that direction before the cars came into sight and may have been looking in a different direction at the time he pulled out. Mr. Glennon also testified that the exit had sight obstructions in the southeast quadrant of the intersection,

which was the area to the left of where Mr. Klammer was stopped in preparing to exit onto Blue Ridge Boulevard. These sight obstructions included a fence, trees, and parked cars. Mr. Glennon testified that in his expert opinion, the intersection was hazardous and that sight obstructions and the curve of the roadway contributed to cause the accident.

 Although the record does not contain direct proof that Mr. Klammer failed to see the approaching eastbound vehicles due to the sight restrictions at the intersection, "a plaintiff is not required to prove all elements of negligence by direct evidence." *Larison*, 998 S.W.2d at 196. "The elements of negligence may be shown by circumstances from which they may be inferred." *Id.* Indeed, "[c]ircumstantial evidence is viewed no differently from direct evidence when determining whether there was a genuine issue as to any material fact so as to preclude summary judgment." *Daniels v. Senior Care, Inc.*, 21 S.W.3d 133, 139 (Mo.App.2000).

 The circumstantial evidence in this case was that the exit from which Mr. Klammer was leaving The Farm Center's parking lot has a sight distance to the left that was below the minimum sight distance recommended by the AASHTO and sight obstructions on the left side. That the exit was located on a curve exacerbated the sight distance restrictions. Minimum sight distances are necessary because drivers have multiple directions to look in and consider. This evidence, combined with Mr. London's testimony that Mr. Klammer pulled out into the intersection at a slow rate of speed, supports an inference that,

**3.** Although the speed limit on Blue Ridge Boulevard was thirty-five miles per hour, Mr. Glennon testified that the restricted sight distance made the intersection hazardous for any speed over twenty-eight miles per hour.

**4.** The answers to interrogatories provided by the City reflect that eleven accidents had occurred at or near the middle exit from the parking lot between January 18, 1995, and January 2000.

while Mr. Klammer may have appeared to Ms. Hollon to have been looking at the eastbound traffic, he did not actually see the eastbound traffic approaching before he pulled out into the intersection, and his failure to see the eastbound traffic was due to the sight restrictions at the intersection. *See Oldaker,* 869 S.W.2d at 101.[5] Thus, the record contains evidence and inferences supporting both sides on this issue. "[I]f the record contains competent evidence that two plausible, but contradictory accounts of essential facts exist, then a genuine issue of material fact remains to be resolved, because fair minded people, exercising reasonable judgment could reach different conclusions on the issue in controversy." *Larison,* 998 S.W.2d at 196.

Moreover, even if the evidence conclusively established that Mr. Klammer was negligent in pulling out into the intersection, his negligence does not negate the causation element. "[I]f two or more persons are guilty of consecutive acts of negligence there is a question as to whether the initial act of negligence was a proximate cause of the injury or whether there was an efficient, intervening cause." *Heffernan v. Reinhold,* 73 S.W.3d 659, 665 (Mo. App.2002). "An efficient, intervening cause is a new and independent force which so interrupts the chain of events

that it becomes the responsible, direct, proximate, and immediate cause of the injury, but it may not consist of merely an act of concurring or contributing negligence." *Id.*

Thus, even if the undisputed facts established that Mr. Klammer operated his vehicle in a negligent fashion and that a causal relationship existed between that negligence and the accident, such evidence is insufficient, in and of itself, to establish that the condition of the intersection was not also a proximate, concurrent cause of the accident. "Proof of other negligence concurring with that of respondent to cause the accident would not defeat appellant's claim, but would only permit an apportionment of fault." *Fox v. City of St. Louis,* 823 S.W.2d 22, 24 (Mo.App.1991). *See Williams,* 16 S.W.3d at 612 (holding that uninsured motorist's alleged negligence was not an intervening cause sufficient to preclude liability on the part of the Missouri Highway and Transportation Commission based upon the alleged dangerous condition of nonfunctioning traffic lights at intersection); *Smith,* 37 S.W.3d at 798–99, 801 (rejecting the Missouri Highway and Transportation Commission's arguments that its failure to provide a clearly delineated stop bar at an intersection

**5.** In *Oldaker,* the Missouri Highway and Transportation Commission argued that there was no direct evidence that the lack of lighting at the highway interchange where the accident occurred caused the accident itself. 869 S.W.2d at 101. The plaintiff presented testimony from a traffic engineer that the lack of lighting created a hazard at the accident site and there was insufficient lighting for safe observation of the roadway. *Id.* at 100–01. The plaintiff also presented testimony from another driver that he had not been able to see the first vehicle along the side of the road until his headlights illuminated it. *Id.* at 101. The court held that while "there was no testimony from Mr. Peters offered into evidence, the testimony of [the expert] and [the other

driver] was sufficient to establish, by way of the circumstances which existed, a causal connection between the Peters accident and the lack of lighting." *Id. See also Poloski v. Wal–Mart Stores, Inc.,* 68 S.W.3d 445, 448–50 (Mo.App.2001) (holding sufficient evidence of causation related to store's failure to provide speed bumps or to design its parking lot traffic pattern to reduce vehicle speeds in front of the store where woman driving parallel to store near the entrances was looking to the left for parking spots when she hit a woman exiting the store with a shopping cart, despite no expert testimony that speed was a factor in the accident or that the presence of speed bumps would have slowed the driver).

with a stop sign could not be a dangerous condition that the plaintiff's injuries directly resulted from where the evidence reflected that one defendant driver was driving under the influence of alcohol, failed to keep a careful lookout, failed to yield the right of way, and failed to take evasive action, and the other defendant driver failed to keep a careful lookout, drove in excess of the speed limit, and failed to take evasive action); *Linton,* 980 S.W.2d at 7 (holding proof of driver's negligence in driving while intoxicated was not a supervening cause sufficient to preclude liability on the part of the Missouri Highway and Transportation Commission based upon the alleged dangerous condition of the road and that damages were properly apportioned between these concurrent acts of negligence); *Martin,* 981 S.W.2d at 584 (noting that the fact that a driver's own negligence may have led to her car leaving the highway did not preclude her claim that the highway department was negligent in allowing a tree to be planted too close to the highway on an unrecoverable slope and that such a dangerous condition caused injury to her because it was foreseeable that a driver would leave the roadway at that spot in a curve and the jury could reasonably infer that, but for the presence of the tree, she would not have sustained fatal head injuries).

In *Yates v. Butler County,* 929 S.W.2d 264, 265 (Mo.App.1996), the plaintiff, a passenger in a car that left a bridge and went into a drainage ditch, alleged that a county was negligent in failing to erect guardrails on the side of the road and failing to warn of the approaching bridge and its dangerous nature. *Id.* The driver of the car testified in her deposition that she did not apply her brakes until her passengers asked her loudly if she saw the upcoming bridge and that, after she applied the brakes, the car skidded off of the road. *Id.* The county relied upon this testimony and the investigating officer's report to assert that the driver's negligence was the sole cause of the accident and should preclude liability on its part for any dangerous condition of the roadway. *Id.* On appeal from summary judgment in favor of the county, the Southern District held that the testimony relied upon was not sufficient to warrant summary judgment because "[n]either the driver's testimony nor the highway patrolman's statement and report establish that [the county] was not negligent." *Id.*

As in *Yates,* the motions for summary judgment in this case failed to establish that any alleged negligent actions on the part of Mr. Klammer precluded the possibility that the condition of the intersection was a concurrent cause of the accident. As previously noted, none of the evidence conclusively established that Mr. Klammer's ability to see the eastbound traffic was not impaired by the sight restrictions at the intersection, or that any such impairment did not play a role in his decision to enter the intersection. Moreover, none of the evidence set forth in the motions establish that the condition of the intersection did not contribute to cause Mr. Gallagher's injuries. As such, the evidence relied upon by the City and J & D Enterprises does not preclude a finding that the accident could have been avoided or the injuries to Mr. Gallagher mitigated but for the condition of the intersection.

The evidence set forth by the City and J & D Enterprises simply does not establish, as a matter of law, that the condition of the intersection did not contribute to cause the collision. Thus, even assuming that a causal connection could be established between the negligence of Mr. Klammer and the accident, rendering him liable to Mr. Gallagher, this fact would be insufficient, in and of itself, to negate proximate cause. Accordingly, the City and J & D Enter-

prises failed to make a *prima facie* case for summary judgment on the issue of causation, and the trial court erred in granting summary judgment on this basis.

### No Sovereign Immunity Based Upon Governmental Acts

In its second point on appeal, UMB asserts that the trial court erred in granting summary judgment to the City to the extent it based its judgment on a finding that the dangerous condition of the road was the result of zoning decisions for which sovereign immunity was not waived. In its summary judgment motion, the City argued that the dangerous condition alleged by UMB arose from decisions related to planning and zoning. The City contended that, as a result, the allegedly negligent acts of the City were governmental acts for which it had immunity under the public duty doctrine.

 Section 537.600 "establishes an absolute waiver of immunity in the instances specified and abolishes any distinction between governmental and proprietary acts as a test of governmental liability." *Linton*, 980 S.W.2d at 6. "Although municipalities are not ordinarily liable for torts arising out of the performance of 'governmental' functions benefiting the general public, the extent of such common law immunity is codified in section 537.600, and that section provides in part for express waivers of immunity in cases of injuries caused by the dangerous condition of the public entity's property." *Fox*, 823 S.W.2d at 24. "The statute constitutes a separate waiver of immunity even in those situations in which the 'public duty' rule might otherwise apply to deny a civil action for damages for negligence arising out of duties to the general public." *Id.* at 24–25. Therefore, if the portion of Blue Ridge Boulevard and the intersection at issue in

this case constituted a dangerous condition of public property, it does not matter whether that condition was created by a governmental act. Summary judgment for the City was not properly granted on this basis.

Next, although the trial court made no findings on this argument and the parties do not address this argument on appeal, because this court must affirm the grant of a summary judgment if it would have been proper on any of the grounds asserted in the summary judgment motion, this court must also consider the remaining argument offered by the City in its motion. In its final argument for summary judgment, the City contended that the failure to post warning signs, the failure to reduce the speed limit on the street, and the failure to provide traffic control devices could not serve to establish a dangerous condition of public property under Missouri case law.

 The City's argument is incorrect as a matter of law. "A dangerous condition of a public highway or road can be pled by allegations of negligent, defective, or dangerous design." *Yates*, 929 S.W.2d at 265. "Signs and traffic controls can be a part of negligent, defective, or dangerous maintenance and design of state roads and highways." *Linton*, 980 S.W.2d at 9. Accordingly, a dangerous condition of public property may arise from a general failure to post adequate signing or traffic controls. *Id.* at 7. *See also Cole v. Mo. Highway & Transp. Comm'n*, 770 S.W.2d 296, 297–98 (Mo.App.1989) (reversing trial court's dismissal of petition alleging failure to warn of allegedly dangerous condition through proper signing and road marking); *Wilkes v. Mo. Highway & Transp. Comm'n*, 762 S.W.2d 27, 28–29 (Mo. banc 1988) (reversing a summary judgment in favor of defendant based on a petition alleging the failure to erect signs warning plaintiff of an allegedly dangerous condi-

tion). The City was not entitled to summary judgment on this basis.

The summary judgment in favor of the City and J & D Enterprises is reversed, and the cause is remanded.

All concur.